1  ERIC GRANT
   United States Attorney
2  MICHAEL D. ANDERSON
   ROSANNE RUST
3  KATHERINE T. LYDON
   Assistant United States Attorneys
4  501 I Street, Suite 10-100
   Sacramento, CA 95814
5  Telephone: (916) 554-2700

6  ALEXANDRE DEMPSEY
   Trial Attorney
7  Public Integrity Section
   U.S. Department of Justice
8  1301 New York Avenue, NW
   Washington, D.C. 20530
9

10 Attorneys for Plaintiff
   United States of America
11

12              IN THE UNITED STATES DISTRICT COURT

13                 EASTERN DISTRICT OF CALIFORNIA

14

   UNITED STATES OF AMERICA,          CASE NO. 2:25-cr-0252 TLN
15
                      Plaintiff,       18 U.S.C. § 371 – Conspiracy (2 counts); 18 U.S.C.
16                                     § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal
                   v.                  Forfeiture
17
   GREG CAMPBELL,
18
                      Defendant.
19

20

21                          I N F O R M A T I O N

22 COUNT ONE: [18 U.S.C. § 371 – Conspiracy to Commit Bank Fraud and Wire Fraud]

23        The United States Attorney charges:

24                          GREG CAMPBELL,

25 defendant herein, as follows:

26 ///

27 ///

28 ///

# I.    **INTRODUCTION**

At all times relevant to the Information:

## A.   **The Conspirators**

1.     Co-Conspirator 1 was the founder and owner of Company A. Co-Conspirator 1, through Company A, provided public affairs, lobbying, and political consulting services to entities attempting to influence decision making in California government. In or about late 2022, Co-Conspirator 1 left her private employment and accepted a position as the Chief of Staff to a California elected official. She held that position until in or about December 2024.

2.     Co-Conspirator 2 was a former California public official, and the founder and owner of Company B. Through Company B, Co-Conspirator 2 provided consulting services to those seeking to influence legislation and decision making in California government.

3.     GREG CAMPBELL was a registered lobbyist and a founding member of Company C, a hub for public affairs, campaign, crisis management, communications and lobbying firms in California. CAMPBELL also founded and owned Company D, a lobbying company which represented clients seeking to influence legislation and decision making in California government.

4.     Co-Conspirator 4 was a federal employee serving as the Chief of Staff to Public Official 1. As the Chief of Staff to Public Official 1, Co-Conspirator 4 had significant influence over federal decision making and contracts. In that position, he was also bound by federal ethics and disclosure rules regarding outside income and employment. Co-Conspirator 4 resided near both Sacramento, California and Washington, D.C., traveling back and forth between the two locations from 2022 through 2024.

5.     Co-Conspirator 5 ("Co-Conspirator 4's spouse") was a stay-at-home mother, who had prior work experience in the media industry.

## B.   **The Dormant Campaign Funds**

6.     Public Official 1 was a federal public official but had previously held other federal and California state positions. Co-Conspirator 4 had worked for Public Official 1 for many years while Public Official 1 held a variety of public offices. Based on the prior relationship and Co-Conspirator 4's position as Chief of Staff, Co-Conspirator 4 had a relationship and position of trust with respect to Public Official 1 and Public Official 1's campaign organization.

7. Immediately prior to accepting his federal appointment, Public Official 1 served in a California state elected office. As a state elected official, Public Official 1 maintained one or more bank accounts containing campaign contributions that were designated for future electoral campaigns.

8. When Public Official 1 entered federal office, federal ethics rules prohibited Public Official 1 from actively engaging in campaign-related activities. To comply with these rules, Public Official 1 stopped campaign activity, allowing his campaign account to become dormant. Public Official 1 moved the existing state campaign funds to a new campaign account for a future campaign. In these accounts (collectively, "the dormant campaign accounts" or the "campaign accounts"), the funds were to be used for basic account maintenance and not for any active campaign-related activity. Public Official 1 delegated to Co-Conspirator 4 responsibility for arranging for the funds in the dormant campaign accounts to be monitored and overseen by a third party.

9. Law Firm 1 was a California-based law firm that specialized in providing legal advice related to campaign finance laws and regulations and in managing campaign accounts. It was led by Lawyer 1, an experienced legal practitioner, and employed a number of lawyers and non-lawyer employees. Law Firm 1 oversaw the dormant campaign accounts for Public Official 1, issued payments, and prepared campaign financial disclosures that were required under California state law.

10. Before Law Firm 1 would issue a payment from the dormant campaign accounts, Law Firm 1 required authorization of the payment or recurring payments. Law Firm 1 would review the payments and the payments' stated purpose to ensure compliance with rules and regulations regarding expenditure of campaign funds. Law Firm 1, however, was not responsible for ensuring that the services or goods billed were, in fact, provided. Nor was Law Firm 1 responsible for conducting independent research into the purpose of the expenditures. Instead, Co-Conspirator 4, or a person designated by Co-Conspirator 4, was responsible for authorizing payments and ensuring that the payments were for goods and services that were provided as stated. Except for the payments that are the subject of the charges in this Information, payments from the dormant campaign accounts were typically for small amounts for expenses such as website maintenance and minor office expenditures.

11. When a payment was approved, or a previously-approved recurring payment invoiced, Law Firm 1 would authorize payment from the dormant campaign accounts. The dormant campaign

1 | account funds were held at Bank 1.

2 | 12. Bank 1, as well as Bank 2 and Credit Union 1, were financial institutions as defined in
3 | Title 18, United States Code, Section 20.

4 | **II.       THE CONSPIRACY AND ITS OBJECTS**

5 | 13. From in or about February 2022, through in or about September 2024, in Sacramento, El
6 | Dorado, and Yolo Counties, within the State and Eastern District of California, and elsewhere, defendant
7 | CAMPBELL did knowingly and intentionally combine, conspire, confederate, and agree with Co-
8 | Conspirator 1, Co-Conspirator 2, Co-Conspirator 4, and Co-Conspirator 5, and others known and
9 | unknown to the United States to commit offenses against the United States, with each offense
10 | constituting an object of the conspiracy, to wit:

11 | a.     To knowingly execute and attempt to execute, a scheme and artifice to obtain any
12 | of the moneys, funds, credits, assets, securities, and other property owned by, and under the
13 | custody and control of, a financial institution, by means of materially false and fraudulent
14 | pretenses, representations, promises, half-truths and the omission of material facts for which
15 | there was an independent duty to disclose, that is, Bank Fraud, in violation of Title 18, United
16 | States Code, Section 1344(2).

17 | b.     To knowingly devise, intend to devise, and participate in a material scheme and
18 | artifice to defraud and to obtain money by means of materially false and fraudulent pretenses,
19 | representations, promises, half-truths, and the omission of material facts for which there was an
20 | independent duty to disclose, and to cause interstate and foreign wire transmissions, that is Wire
21 | Fraud, in violation of Title 18, United States Code, Section 1343.

22 | 14. The purpose of the conspiracy and scheme to defraud was to steal money from Public
23 | Official 1's dormant campaign accounts for Co-Conspirator 4's own benefit. The money taken from the
24 | dormant campaign accounts was covertly funneled through companies controlled by Co-Conspirator 1,
25 | Co-Conspirator 2, and CAMPBELL to hide the money's origin and avoid detection. Then it was
26 | disguised as pay to Co-Conspirator 4's spouse for a "no-show" job and transferred into an account
27 | controlled by Co-Conspirator 4.

28 |

## III.    MANNER AND MEANS

In furtherance of the conspiracy, the conspirators employed, among others, the following manner and means:

15.    In or about February 2022, Co-Conspirator 1, who was working in public affairs and lobbying, and Co-Conspirator 4, who was a federal employee, met and discussed Co-Conspirator 4's desire to have more money while continuing to work as Chief of Staff to Public Official 1.

16.    Co-Conspirator 4 and Co-Conspirator 1 agreed that Co-Conspirator 1 would bill Public Official 1's dormant campaign account for purported consulting services for overseeing the account at a rate of $7,500 per month.  This money was intended to subsidize $10,000 payments that Co-Conspirator 1 would make each month to benefit Co-Conspirator 4 financially.

*Conduit payments*

17.    Beginning in or about April 2022, as agreed, Co-Conspirator 1 paid $10,000 per month to Company C, an entity which was consistently controlled by CAMPBELL, with, at times, Co-Conspirator 1 or Co-Conspirator 2, over and above any payments she would otherwise make to Company C.  Company C, through a third-party payroll services provider, then paid $10,000 per month into a bank account Co-Conspirator 4 controlled.  These payments were disguised as income to Co-Conspirator 4's spouse for work supposedly done for Co-Conspirator 1.  In fact, Co-Conspirator 4's spouse did not do any work for Co-Conspirator 1, Company A, or Company C, and Co-Conspirator 4's spouse did not communicate with Co-Conspirator 1 once the paperwork was completed to initiate the payments.

18.    In or about November and December 2022, as Co-Conspirator 1 was preparing to reenter state government service, Co-Conspirator 1 arranged for Co-Conspirator 2 to join the conspiracy in order to take over Co-Conspirator 1's role in concealing the payments to Co-Conspirator 4.  In early 2023, Co-Conspirator 2 began billing the dormant campaign account for purported consulting services at a rate of $10,000 per month.  Typically, once Co-Conspirator 2's company (Company B) received the money, Co-Conspirator 2, or someone at her direction, would deposit the money into an account at Bank 2.  Co-Conspirator 2 would then pass the $10,000 payment through to Company C.  In some instances, Co-Conspirator 2 would pass through the money before receiving it from the dormant campaign

account. Company B's payments to Company C were generally disguised by inflating the amount of rent and overhead Company B paid Company C each month, increasing the purported rent payments from approximately $10,700 to $20,700. Company C, which was consistently controlled by CAMPBELL, with, at times, Co-Conspirator 1 or Co-Conspirator 2, would then pay $10,000 through a third-party payroll provider into an account Co-Conspirator 4 controlled at Credit Union 1. These payments continued to be disguised as pay for work supposedly performed by Co-Conspirator 4's spouse for Co-Conspirator 2. Co-Conspirator 4's spouse, however, did not do work for Co-Conspirator 2, Company B, Company C, or CAMPBELL.

19. The flow of the money from the dormant campaign accounts to Co-Conspirator 4 is represented, in summary, graphically below:



*False statements and omissions*

20. As part of the conspiracy, and in furtherance of their scheme, the conspirators made and caused others to make materially false statements, and material omissions for which they had an independent duty to disclose, to initiate and continue payments from the dormant campaign accounts.

21. The false statements and omissions included those made by Co-Conspirator 4 and Co-Conspirator 1 to Public Official 1. For example, Co-Conspirator 4 had conversations with Public Official 1 to initially set up the payments and again when Co-Conspirator 2 replaced Co-Conspirator 1 as the conduit. In those discussions, Co-Conspirator 4 informed Public Official 1 that $10,000 per month was a reasonable amount to pay for monitoring the dormant campaign accounts and that Co-Conspirator 1, and later Co-Conspirator 2, were willing to take on the role. Co-Conspirator 4 also told Public Official 1 that Co-Conspirator 4's spouse had obtained employment working with Company A. Co-Conspirator 4 and Co-Conspirator 1, however, intentionally misrepresented and concealed material facts from Public Official 1, including falsely representing that the money from the dormant campaign

accounts was payment for consulting services to Co-Conspirator 1 and, later, Co-Conspirator 2. Co-Conspirator 4 and Co-Conspirator 1 also omitted and concealed that the money was being passed through to Co-Conspirator 4's spouse, that his spouse was not doing any work, that his spouse was not working for any other clients of her purported employers, and that the payments from the dormant campaign account were not for the purpose of obtaining consulting services but were rather a means to personally enrich Co-Conspirator 4. Co-Conspirator 4 and Co-Conspirator 1 made these misrepresentations and omissions because they believed, correctly, that Public Official 1 would not have permitted the payments if Public Official 1 had known the truth.

22. The invoices Co-Conspirator 1 and Co-Conspirator 2 submitted to Law Firm 1 to initiate the payments from the dormant campaign accounts were also false and misleading in that they claimed the money they were paid was for Co-Conspirator 1 and Co-Conspirator 2 providing consulting services to the campaign. In fact, the money was not being paid for those services; instead, the money was being paid so that it could be passed through to Co-Conspirator 4. Had Law Firm 1 known the true facts, it would not have made the payments.

23. To make it appear to Law Firm 1 as though the invoices from Co-Conspirator 1 and Co-Conspirator 2 were for legitimate services rendered, Co-Conspirator 4 would personally approve or have his spouse approve the invoices. In doing so, the personal relationship between Co-Conspirator 4 and his spouse, who had a different surname, was not disclosed to employees at the Law Firm 1. This omission was material in that it made it less likely that Law Firm 1 would ask additional questions, discover the illegal nature of the scheme, and refuse to issue payments.

*Additional false statements and omissions*

24. To further support the scheme and prevent or delay its detection, the conspirators also made, or caused others to make, materially false statements and omissions in state campaign financial disclosures, to government ethics counsel, and to the media.

25. As alleged above, Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 4 provided false and misleading information about the dormant campaign expenses, including through emails and invoices sent to Law Firm 1's employees. In addition to using this information as described above to issue payments from the dormant campaign accounts, Law Firm 1 used this information to prepare

California Fair Political Practices Commission (FPPC) Form 460 campaign disclosures. Because the information provided to Law Firm 1 was false and misleading, Law Firm 1 prepared Form 460s that falsely reported that the monthly campaign expenditures to Co-Conspirator 1 and Co-Conspirator 2 were for campaign consultant services. The Form 460s were then reviewed by Co-Conspirator 4 and/or Public Official 1 and publicly filed with the California Secretary of State. This created the false appearance of propriety and legal review related to the payments, which furthered the scheme by making it less likely that it would be detected by Public Official 1 and Law Firm 1, either directly, or through public or media scrutiny of the arrangement.

26. Likewise, when Co-Conspirator 4 sought ethics approval for his wife's employment from the counsel's office at the federal department where he was Chief of Staff, Co-Conspirator 4 intentionally concealed that the employment was for a no-show job and that his spouse's pay would come from money passed through a conduit scheme from Public Official 1's dormant campaign funds. Instead, Co-Conspirator 4 affirmatively misrepresented that his spouse would be working as a "communications consultant" "advising on digital ad placements and misc. communications for political campaigns." This was not just a misrepresentation that Co-Conspirator 4's spouse would be working when she was not; it was also part of the misrepresentation about who she would be doing work for and how she was getting paid.

27. Communications consulting for political campaigns was a job that was unnecessary and illegal for the dormant campaign because Public Official 1 was prohibited from campaigning while serving in a high-level appointment in the federal government. By claiming that his spouse was performing that type of work, Co-Conspirator 4, in effect, represented that his spouse was doing work that was unconnected to Public Official 1's dormant campaign accounts. As a result of these false statements and omissions, Co-Conspirator 4 obtained ethics approval for his spouse's purported employment. This further created an unwarranted aura of legitimacy around the payments, including reducing the likelihood of objections from Public Official 1 who expected that ethics counsel would be consulted about the propriety of the purported employment relationship.

28. In or about April 2024, Co-Conspirator 1, after consulting with one or more co-conspirators, also approved a false and misleading statement for Law Firm 1 to provide in response to a

press inquiry. In the statement, Law Firm 1 repeated false information about Co-Conspirator 2's consulting work for the campaign and concealed the pass-through nature of the scheme, which was unknown to Law Firm 1. This was done in furtherance of the objects of the conspiracy, since it, among other things, helped evade detection of the scheme and allowed it to continue.

*Coordination and cover-up*

29. Co-Conspirator 1 also worked to coordinate among the members of the scheme when their interests might not otherwise align. For example, when Co-Conspirator 4's spouse refused to sign a backdated contract in the Spring of 2024, Co-Conspirator 1 told Co-Conspirator 4 that she would talk to Co-Conspirator 2 and take care of it.

30. It was further a part of the manner and means of the conspiracy and scheme, that the conspirators worked together to avoid detection. Co-Conspirator 1, Co-Conspirator 2, and CAMPBELL met and communicated on several occasions in 2024, in varying combinations, to discuss ending or continuing the scheme, to share information pertinent to maintaining the secrecy of the scheme from unknowing participants and outsiders, and to reinforce the bond of secrecy among themselves. Co-Conspirator 4, Co-Conspirator 1, and Co-Conspirator 2 also met and communicated in varying combinations on several occasions in 2024 for the same purpose. For example, on or about July 29, 2024, when Co-Conspirator 1, Co-Conspirator 2, and CAMPBELL discussed the scheme prior to Co-Conspirator 2 interacting with Lawyer 1 regarding the payments from the dormant campaign account, Co-Conspirator 2 asked Co-Conspirator 1 if Lawyer 1 was aware of the scheme. Co-Conspirator 1 answered, quietly whispering, "no."

31. Likewise, later in the conversation, CAMPBELL reinforced the importance of not having payments from the campaign account to Co-Conspirator 2 end at the same time the payments to Co-Conspirator 4's spouse stopped. Instead, CAMPBELL suggested paying Co-Conspirator 4's spouse for a few more months than Co-Conspirator 2 billed the campaign. The extra payments, CAMPBELL suggested, would make it appear as though the two sets of payments were unconnected, thereby helping to conceal that the purpose of the dormant campaign account payments was so that they could be passed through to Co-Conspirator 4.

32. When the scheme ended in or about September 2024, Co-Conspirator 4, with the help of

1 | Co-Conspirator 1, Co-Conspirator 2, CAMPBELL, and Co-Conspirator 5, had stolen approximately

2 | $225,000 of campaign funds for Co-Conspirator 4's own use.

## IV.    OVERT ACTS

In furtherance of said conspiracy and to accomplish its objects, at least one of the conspirators committed, or caused to be committed, in the State and Eastern District of California, the following overt acts, among others:

33.    On or about February 18, 2022, Co-Conspirator 1 and Co-Conspirator 4 met in person at a restaurant near midtown Sacramento, California, where they began planning the scheme.

34.    On or about February 22, 2022, Co-Conspirator 4 and Co-Conspirator 1 exchanged text messages regarding the scheme:

Co-Conspirator 4:    Talked to [Public Official 1]. He wanted me to talk to you. Let me know when is a good time to call.

Co-Conspirator 1:    I'm scared.

Co-Conspirator 4:    I can talk now. Don't be scared.

Co-Conspirator 1:    Call me

35.    On or about February 22, 2022, Co-Conspirator 4 called Co-Conspirator 1's phone. The call was connected for approximately 20 minutes.

36.    On or about March 9, 2022, Co-Conspirator 1 and Co-Conspirator 4 texted about delays involving the Law Firm 1:

Co-Conspirator 4:    Staying or leaving is complicated and happy to talk more. Is there a way to get [Lawyer 1] moving like [Public Official 1] or myself calling him?

Co-Conspirator 1:    I didn't tell him it was for you

Co-Conspirator 1:    I called again this am

Co-Conspirator 4:    BTW, I don't want you paying for this. I appreciate it.

37.    On or about March 10, 2022, Co-Conspirator 4 texted Co-Conspirator 1 that "[Public Official 1] wants to know a reasonable amount to pay someone to manage his accounts . . . he is looking for an example of some firm that puts in writing that this is what they would charge."

38.    On or about March 14, 2022, Co-Conspirator 1 met with Public Official 1 at Co-

Conspirator 4's encouragement.

39. Following Co-Conspirator 1's meeting with Public Official 1, on or about March 14, 2022, Co-Conspirator 1 texted Lawyer 1, "Hey. Talked to [Public Official 1] so give me a call when you can."

40. On or about March 17, 2022, Co-Conspirator 1 texted Lawyer 1, "Let's do 7500. Start March 1 ongoing with 30 day out."

41. On or about March 18, 2022, Co-Conspirator 4 emailed Co-Conspirator 1 seeking information that he could provide to ethics counsel at Co-Conspirator 4's federal employer regarding his spouse's purported employment with Company A.

42. On or about March 21, 2022, Co-Conspirator 4 texted Co-Conspirator 1, "I sent you an email with the questions that [Federal Agency] will want an answer [on]. . . . We can move on hiring [my spouse] before that process plays out. It would be best for us if [she] is hired as an employee so I do not have to figure out taxes. Let me know what I have to provide to you to get the process started."

43. On or about March 28, 2022, Co-Conspirator 1 emailed Co-Conspirator 4 information to provide to ethics counsel regarding Co-Conspirator 4's spouse's purported employment with Company A. Co-Conspirator 1 stated that Co-Conspirator 4's spouse would be "Advising on digital ad placements and misc. communications for political campaigns."

44. On or about March 28, 2022, Co-Conspirator 4 texted Co-Conspirator 1 asking, "How do we move [my spouse] forward with getting [her] hired on? I have some commitments to make so I am just trying to make sure we are good for March."

45. A few days later, on or about April 1, 2022, Co-Conspirator 1 responded to Co-Conspirator 4 and she said, "You are good for March. Give [your spouse] my contact and I'll get it all set up."

46. On or about April 5, 2022, Co-Conspirator 4 texted Co-Conspirator 1 to ask, "Is there any chance you could pay [my spouse] this week for March? We are making monetary commitments for travel and I want to make sure I have the resources. Thanks."

47. On or about April 20, 2022, Co-Conspirator 4 repeated the information provided by Co-Conspirator 1 on or about March 28, 2022, in an email to ethics counsel.

1    48.    On or about August 8, 2022, Co-Conspirator 1 or someone acting at her direction emailed
2    Lawyer 1 an invoice for $45,000 requesting payment for "Consulting" "Account Maintenance (March –
3    August 2022."

4    49.    On or about August 19, 2022, in reply to an email chain from Lawyer 1 asking, "Can you
5    confirm that we are authorized to make this $45,000 payment to [Co-Conspirator 1] for consulting fees,"
6    Co-Conspirator 4 emailed stating that Co-Conspirator 1's invoice was approved, "Yes. It is approved.
7    [Pronoun representing Public Official 1] wanted to compensate her for her work with the campaign
8    accounts."

9    50.    On or about November 2, 2022, Co-Conspirator 1 called Co-Conspirator 4.  The call was
10   connected for approximately eight minutes.

11   51.    On or about November 2, 2022, Co-Conspirator 1 initiated a group text message chain
12   introducing Co-Conspirator 2 to Co-Conspirator 4.

13   52.    On or about November 2, 2022, Co-Conspirator 4 called Co-Conspirator 2.  The call was
14   connected for approximately 16 minutes.

15   53.    On or about November 21, 2022, Co-Conspirator 1 or someone acting at her direction
16   emailed an invoice for $32,500 to Law Firm 1 requesting payment for "Consulting" "Account
17   maintenance" for September to December 2022.

18   54.    On or about December 5, 2022, a Company C employee emailed Co-Conspirator 1
19   asking if Co-Conspirator 4's spouse could be switched from an employee to a 1099 contractor.

20   55.    On or about January 2, 2023, Co-Conspirator 1 emailed CAMPBELL, Co-Conspirator 2,
21   and a Company C employee stating, "[Co-Conspirator 2] will invoice [Public Official 1's] campaign for
22   $10,000 per month via [Company B]" so Co-Conspirator 2 can "cover [Co-Conspirator 4's spouse's]
23   contract ($120,000)."

24   56.    On or about January 24, 2023, Co-Conspirator 1 emailed Lawyer 1, copying Co-
25   Conspirator 2, stating "Hi – Including [Co-Conspirator 2]; [he/she] will be your contact going forward.
26   Invoices will now be for $12,500/mo. per [Co-Conspirator 4's initials].  D."

27   57.    On or about January 24, 2023, Co-Conspirator 1 emailed Co-Conspirator 4's spouse and
28   Co-Conspirator 2, stating "[Co-Conspirator 4 spouse] – Please meet [Co-Conspirator 2] who will be

handling your invoices going forward. [Co-Conspirator 1]."

58.     On or about January 24, 2023, Co-Conspirator 4's spouse sent an email to a Company C employee clarifying that it was $10,000 per month, not $12,500.

59.     On or about January 24, 2023, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

60.     On or about January 24, 2023, Co-Conspirator 4 approved Co-Conspirator 2's first invoice for "consulting services" to the dormant campaign.

61.     On or about January 30, 2023, a Company C employee sent an email to CAMPBELL and Co-Conspirator 2, stating "Below is the February contribution to [Company C]: [Co-Conspirator 2]: $10,700 + $10,000 (Feb [Co-Conspirator 4's spouse] = **$20,700**"

62.     On or about February 15, 2023, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

63.     On or about February 17, 2023, Co-Conspirator 4 responded to Law Firm 1's request to "auto-pay" the "monthly invoices from [Company B] moving forward" by declining that request and instead, informing it that Co-Conspirator 4's spouse would be taking over for him as the person handling the invoice approvals for the payments sought by, or on behalf of, Co-Conspirator 2 and Company B.

64.     On or about February 21, 2023, a Company C employee emailed CAMPBELL and Co-Conspirator 2, asking: "[CAMPBELL] . . . —let me know if you'd like me to transfer [the funds]. [Co-Conspirator 2]: $10,700 + $10,000 (March [Co-Conspirator 4's spouse]) = $20,700 (I invoiced [Lawyer 1] on 2/14 for March so you should receive payment soon.)"

65.     On or about February 21, 2023, Co-Conspirator 2 responded by email to the Company C employee and CAMPBELL that, "I will write a check once I get the funds from [Lawyer 1]!"

66.     On or about March 1, 2023, Co-Conspirator 4's spouse again refused to give "approval to automatically pay the monthly [Company B] invoices" and instead, had Law Firm 1 "continue to send the invoices to [her] for approval."

67.     On or about March 3, 2023, a Company C employee emailed Co-Conspirator 4's spouse explicitly linking the payments from the campaign to the pass-through payments:

>     "I wanted to touch base and let you know that I'm awaiting payment from

the campaign, then I'll send your monthly fee. I expect it will be early next week. Going forward, would you prefer that I send the payment when I receive payment from the campaign, or would you prefer that I just send it at the end of the month. Just let me know. Thank you[.]

68. On or about March 3, 2023, Co-Conspirator 4's spouse responded to the Company C employee's email regarding timing of payments and said, "It would be great if you would s[end] the fee when you receive payment from the campaign. Thanks and have a nice weekend".

69. On or about April 12, 2023, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

70. On or about June 14, 2023, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

71. On or about April 15, 2024, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

72. On or about April 19, 2024, Co-Conspirator 1 emailed Lawyer 1, approving a statement for the Lawyer 1 to release to a reporter as follows:

[Co-Conspirator 2] has been paid to oversee the Committee and manage its operations while [Public Official 1] has been serving in Washington, including payment of ongoing expenses and filing of required campaign reports.

[Co-Conspirator 2] has continued to provide committee management services this year and has been paid for those services.

73. On or about May 6, 2024, a Company C employee acting at the direction of Co-Conspirator 2 emailed Co-Conspirator 4's spouse a backdated work contract, which purported to have been entered in January 2023, asking Co-Conspirator 4's spouse to, "please sign and return."

74. On or about May 9, 2024, Co-Conspirator 4 called Co-Conspirator 1. Co-Conspirator 1 did not answer.

75. Approximately five minutes later, on or about May 9, 2024, Co-Conspirator 1 called Co-Conspirator 4. The call connected for approximately three minutes during which Co-Conspirator 1 said she would take care of the backdated contract with Co-Conspirator 2.

76. On or about June 13, 2024, Co-Conspirator 2 caused a Company C employee to email an invoice for "consulting services" to Law Firm 1.

14

1    77.    On or about July 15, 2024, Co-Conspirator 2 emailed an invoice for "consulting services"
2    to Law Firm 1.

3    78.    On or about July 29, 2024, Co-Conspirator 1, Co-Conspirator 2, and CAMPBELL met at
4    a bar near the California State Capitol and discussed ending the scheme. During the conversation,
5    CAMPBELL explained the need to obfuscate the connection between the payments from the campaign
6    accounts and the payments to Co-Conspirator 4's spouse stating, in part, that "we need to probably eat
7    one or two months so it doesn't line up directly from when you quit and stop paying her" and "whenever
8    you quit we probably have to at least pay one month or otherwise it's going to look—it's going to just
9    raise red flags potentially."

10    79.    On or about August 2, 2024, Co-Conspirator 2 and CAMPBELL met at Company C's
11    business location in Sacramento, California. CAMPBELL discussed ending the scheme and stated that
12    it was "always set up to be somewhat icky," amounted to "laundering money," and was "wrong."

13    80.    On or about August 29, 2024, Co-Conspirator 4 and Co-Conspirator 2 spoke on the
14    phone about Co-Conspirator 2 stopping payments. During this conversation, Co-Conspirator 4 asked
15    Co-Conspirator 2 to continue the arrangement for a time so he could "transition out" of his federal job
16    and try to get his "pension out of the federal government." He explained that the "money you guys are
17    giving me is helping me fly back and forth to to uh DC and live there half part time."

18    All in violation of Title 18, United States Code, Section 371.

19    COUNT TWO: [18 U.S.C. § 371 – Conspiracy to Defraud the United States and Obstruct Justice]

20    The United States Attorney further charges:

21                            GREG CAMPBELL,

22    defendant herein, as follows:

23                        **I.    INTRODUCTION**

24    At all times relevant to the Information:

25    1.    Paragraphs 1 through 3 of Count 1 of the Information are realleged and incorporated
26    herein, as if fully set forth.

27    **A.    The Small Business Administration and the Paycheck Protection Program**

28    2.    The United States Small Business Administration (the "SBA") was an agency of the

United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

3. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law first enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program (the "PPP").

4. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application that was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.

5. Not all businesses could qualify for PPP loans or PPP loan forgiveness. PPP loans could not be used for lobbying activities or expenditures, nor could they be used for "expenditures designed to influence the enactment of legislation, appropriations, regulation, administrative action, or Executive order proposed or pending before Congress or any State government, State legislature, or local legislature or legislative body." Title 15, United States Code, Section 636(a)(37)(F)(vi) (Eff. Dec. 31, 2020). Further, "any business concern or entity primarily engaged in political or lobbying activities" was expressly excluded as an "eligible entity" for the purpose of obtaining PPP second draw loans. Title 15, United States Code, Section 636(a)(37)(A)(iv)(III)(bb) (Eff. Dec. 31, 2020).

**B.      Civil Investigation of Co-Conspirator 1's PPP Loans**

6. The SBA and the Civil Division of the United States Attorney's Office for the Eastern District of California investigated companies engaged in lobbying activity who also obtained PPP loans.

7. Co-Conspirator 1's company, Company A, applied for and received PPP funds and had one or more employees or principals whom public records indicated engaged in lobbying activity.

8. In or about September 2023, the SBA and the Civil Division of the United States Attorney's Office for the Eastern District of California began investigating PPP loans obtained by Co-

1  Conspirator 1's company, Company A.

2  9.    As part of that civil investigation, on or about January 16, 2024, Co-Conspirator 1's

3  company, Company A, was served with a Financial Institutions Reform, Recovery, and Enforcement

4  Act (FIRREA) subpoena.  The subpoena requested documents related to Co-Conspirator 1's company's

5  eligibility for PPP loans, loan forgiveness, and its revenue from lobbying activity.

6  ## II.    THE CONSPIRACY AND ITS OBJECTS

7  10.    From in or about July 2024 through in or about August 2024, in Sacramento County,

8  within the State and Eastern District of California, and elsewhere, CAMPBELL did knowingly and

9  intentionally combine, conspire, confederate, and agree with Co-Conspirator 1 to defraud the United

10  States and an agency thereof, to wit, the United States Department of Justice and the SBA, and to

11  commit offenses against the United States, to wit, to violate Title 18, United States Code, Section 1519.

12  The following were each objects of the conspiracy:

13  a.    To defraud the United States and the SBA by and through deceitful and dishonest

14  means for the purpose of impeding, impairing, obstructing, and defeating the lawful

15  governmental functions of the Department of Justice and the Small Business Administration in

16  investigating and enforcing civil violations of applicable federal law relating to Paycheck

17  Protection Program ("PPP") loans.

18  b.    To impede, obstruct, and influence, an investigation and the proper administration

19  of justice of a matter within the jurisdiction of the United States Department of Justice and the

20  SBA, and in relation to or in contemplation of any such matter or case, by altering, destroying,

21  concealing, covering up, falsifying, and making false entry to a record, document and tangible

22  object, in violation of Title 18, United States Code, Section 1519.

23  ## III.    MANNER AND MEANS

24  In furtherance of the conspiracy, the conspirators employed, among others, the following manner

25  and means:

26  11.    On or about July 29, 2024, Co-Conspirator 1 arranged for Co-Conspirator 1,

27  CAMPBELL, and Co-Conspirator 2 to meet at a restaurant and bar near the California State Capitol.

28  12.    During the July 29, 2024, meeting, Co-Conspirator 1 discussed the FIRREA subpoena

1 from the United States, stating among other things that "I'm still in this like fucking, my PPP loan got
2 popped bullshit." Co-Conspirator 1 asked for CAMPBELL's help creating a contract she could submit
3 in response to the subpoena documenting the purported business relationship between Company A and
4 Company D, even though Co-Conspirator 1 and CAMPBELL never had one for those companies. Co-
5 Conspirator 1 asked CAMPBELL to have "[a Company C employee] do like a retroactive one" and that
6 she would "text you like the years" she needed. Co-Conspirator 1 told CAMPBELL that the contract
7 should "say that you were sub-contracting with me to provide general advice, umm, to your clients,
8 there w—there's no lobbying or influence or anything like that."

9     13.     CAMPBELL agreed and told Co-Conspirator 1 to, "just shoot me a text with what you
10 need it to say, and I'll go ta, go see [the Company C employee] right after this."

11     14.     On or about July 30, 2024, Co-Conspirator 1 texted CAMPBELL, "On the contracts, I
12 need 3 (2019, 2020, 2021) of the same that says [Company A] is sub to various clients of campbell to
13 provide strategic advice. [Company A] is prohibited from providing any lobbying services."
14 CAMPBELL replied, "On it" and then "Do we need amounts?"

15     15.     CAMPBELL then instructed a Company C employee to create the three contracts. The
16 Company C employee did so that day. CAMPBELL, or an employee acting at his direction, backdated
17 the contracts to falsely indicate that they were executed in 2019, 2020, and 2021. The backdated
18 contracts also contained false statements about Co-Conspirator 1 and CAMPBELL's business
19 arrangement, including stating that Co-Conspirator 1's company was not engaging in lobbying activity
20 and misrepresenting that Company A was a subcontractor for Company D when in truth they both did
21 work for shared clients. This reciprocal work arrangement included Co-Conspirator 1 offering lobbying
22 services provided by CAMPBELL to her clients. These statements were intended to make the contracts
23 look like legitimate contracts that had been entered into at the time the services were provided, and to
24 make it appear that Company A was eligible to receive PPP loans and loan forgiveness.

25     16.     Co-Conspirator 1 texted CAMPBELL later that day, on or about July 30, 2024, that she
26 did not think the contracts needed amounts and CAMPBELL agreed, adding "They are all done and here
27 for you when you get a chance. Call me for details if/when you can."

28     17.     On or about July 31, 2024, Co-Conspirator 1 and CAMPBELL arranged by text message

1 | for Co-Conspirator 1 to pick the contracts up in person from the Company C offices, which Co-

2 | Conspirator 1 did.

## IV. OVERT ACTS

In furtherance of said conspiracy and to accomplish its objects, at least one of the conspirators committed, or caused to be committed, in the State and Eastern District of California, the following overt acts, among others:

18. On or about July 30, 2024, Co-Conspirator 1 texted CAMBPELL, stating "I need 3 (2019, 2020, 2021)."

19. On or about July 30, 2024, CAMPBELL instructed an employee to create three contracts for Co-Conspirator 1.

20. On or about July 31, 2024, Co-Conspirator 1 and CAMPBELL exchanged text messages about picking up the contracts from CAMPBELL.

21. On or about July 31, 2024, Co-Conspirator 1 picked up the contracts from CAMPBELL.

All in violation of Title 18, United States Code, Section 371.

FORFEITURE ALLEGATION:     [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture]

Upon conviction of one or more of the offenses alleged in Counts One and Two of this Information, defendant GREG CAMPBELL shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, constituting or derived from proceeds traceable to said violations, including but not limited to:

a.     A money judgment equal to the sum of proceeds traceable to violations for which defendant is convicted.

If any property subject to forfeiture, as a result of the offenses alleged in this Information:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty,

INFORMATION                                    19

it is the intent of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the property subject to forfeiture.

_Eric Grant_

ERIC GRANT
United States Attorney

## United States v. Greg Campbell
### Penalties for Information

### COUNTS 1 and 2:

VIOLATION:      18 U.S.C. § 371 - Conspiracy

PENALTIES:      Up to 5 years in prison; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

### FORFEITURE ALLEGATION:

VIOLATION:      18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) –
Criminal Forfeiture

PENALTIES:      As stated in the charging document