ERIC GRANT
United States Attorney
MICHAEL D. ANDERSON
ROSANNE RUST
KATHERINE T. LYDON
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

ALEXANDRE DEMPSEY
Trial Attorney
Public Integrity Section
U.S. Department of Justice
1301 New York Avenue, NW
Washington, D.C. 20530

Attorneys for Plaintiff
United States of America

**FILED**

NOV 05 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:25-cr-0252 TLN |
|---|---|
| Plaintiff, | PLEA AGREEMENT |
| v. | |
| GREG CAMPBELL, | **UNDER SEAL** |
| Defendant. | |

I.   **INTRODUCTION**

A.   **Scope of Agreement.**

The Information in this case charges the defendant with Conspiracy to Commit Bank Fraud and Wire Fraud, in violation of 18 U.S.C. § 371 (Count One) and Conspiracy to Defraud the United States and to Commit Offenses Against the United States (Count Two). This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California, as well as the Public Integrity Section, Criminal Division, United States Department of Justice (hereinafter

"the government" or "the United States") and the defendant regarding this case. This plea agreement is limited to the government and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

**B.     Court Not a Party.**

The Court is not a party to this plea agreement. Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities which may not have been charged in the Information. The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.     DEFENDANT'S OBLIGATIONS

**A.     Guilty Plea.**

The defendant will plead guilty to Conspiracy to Commit Bank Fraud and Wire Fraud, in violation of 18 U.S.C. § 371 (Count One) and Conspiracy to Defraud the United States and to Commit Offenses Against the United States (Count Two). The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his plea(s) should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a

guilty plea pursuant to this Agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

### 1.    Waiver of Indictment:

The defendant acknowledges that under the United States Constitution he is entitled to be indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed. R. Crim. P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of indictment to the charges set forth in the Information. The defendant agrees that at a time set by the Court, he will sign a written waiver of prosecution by indictment and consent to proceed by information rather than by indictment.

### 2.    Timing of Entry of Plea

The parties anticipate that this agreement will be accepted by the defendant and signed by the parties prior to the filing of the Information or the entry of the plea in Court. After accepting and signing this Agreement, the government shall retain the original signed Agreement until filing it with the Court. Upon written notice from the government to defendant's counsel, the defendant shall enter his change of plea at the next available court date after the government's notice.

### B.    **Restitution.**

The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses. The defendant agrees the conduct to which he is pleading guilty requires mandatory restitution pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii), and agrees to pay restitution to the victim for the total loss to the victim as a result of the scheme in an amount of $225,000. Restitution shall be joint and several with any other co-conspirators for whom restitution is ordered for the same offense(s).

Restitution payments shall be by cashier's or certified check made payable to the Clerk of the Court.

The defendant agrees that all criminal monetary penalties imposed by the court, including restitution, will be due in full immediately at time of sentencing and subject to immediate enforcement by the government. The defendant agrees that any payment schedule or plan set by the court is merely a minimum and does not foreclose the United States from collecting all criminal monetary penalties at any

time through all available means.

The defendant further agrees that he will not seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding.

The defendant shall not sell, encumber, transfer, convey, or otherwise dispose of any of his assets without prior written consent of the United States Attorney, except that the defendant may sell, transfer or convey personal property (including used vehicles and personal items, but not financial instruments, ownership interests in business entities or real property) with an aggregate value of less than $5,000.

### C.    Fine.

The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a fine, and that no fine should be imposed. The defendant understands that it is his burden to affirmatively prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury to the Probation Officer and the government in advance of the issuance of the draft Presentence Investigation Report, along with supporting documentation. The government retains the right to oppose the waiver of a fine. If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered by the Court, up to the statutory maximum fine for the defendant's offense(s).

### D.    Special Assessment.

The defendant agrees to pay a special assessment of $200 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing. The defendant understands that this plea agreement is voidable at the option of the government if he fails to pay the assessment prior to that hearing.

### E.    Violation of Plea Agreement by Defendant/Withdrawal of Plea(s).

If the defendant violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government. If the government elects to void the agreement based on the defendant's violation, the government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. A defendant violates the plea agreement by committing any crime or providing or procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in

any litigation or sentencing process in this case, or engages in any post-plea conduct constituting obstruction of justice. The government also shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement. The determination of whether the defendant has violated the plea agreement will be under a probable cause standard.

In addition, (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

F.   **Asset Disclosure.**

The defendant agrees to make a full and complete disclosure of his assets and financial condition, and will complete the United States Attorney's Office's "Authorization to Release

Information" and "Financial Disclosure Statement" within three (3) weeks from the entry of the defendant's change of plea, including supporting documentation. The defendant also agrees to have the Court enter an order to that effect. The defendant understands that if he fails to complete truthfully and provide the described documentation to the United States Attorney's Office within the allotted time, he will be considered in violation of the agreement, and the government shall be entitled to the remedies set forth in section II.E above.

Defendant expressly authorizes the United States to immediately obtain a credit report to evaluate defendant's ability to satisfy any monetary penalty imposed by the court. Defendant also authorizes the U.S. Attorney's Office to inspect and copy all financial documents and information held by the U.S. Probation Office.

### III. THE GOVERNMENT'S OBLIGATIONS

#### A. Dismissals/Other Charges.

The government agrees not to bring any other charges arising from the conduct outlined in the Factual Basis attached hereto as Exhibit A.

#### B. Recommendations.

1. Incarceration Range.

The government will recommend that the defendant be sentenced to the low end of the applicable guideline range as determined by the Court.

2. Acceptance of Responsibility.

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of his offense level if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

#### C. Use of Information for Sentencing.

The government is free to provide full and accurate information to the Court and Probation,

including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

## IV.     ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offenses to which the defendant is pleading guilty:

**A.    Count One: Conspiracy to Commit Bank Fraud and Wire Fraud, in violation of 18 U.S.C. § 371:**

First, beginning in or about February 2022, and ending in or about September 2024, there was an agreement between two or more persons to commit at least one crime, i.e., Bank Fraud or Wire Fraud, as charged in the Information;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

With respect to the first object of the conspiracy, the elements for Bank Fraud are as follows:

First, a co-conspirator knowingly carried out a scheme or plan to obtain money or property from the financial institution, i.e., Bank 1, by means of false or fraudulent pretenses, representations, or promises or omitted facts;

Second, a co-conspirator knew that the statements or promises were false;

Third, the statements or promises were material; that is, they had a natural tendency to influence, or were capable of influencing, Bank 1 to part with money or property;

Fourth, a co-conspirator acted with the intent to defraud; and

Fifth, Bank 1 was a financial institution.

With respect to the second object of the conspiracy, the elements for Wire Fraud are as follows:

First, a co-conspirator knowingly participated in, devised, or intended to devise a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent

pretenses, representations, or promises or omitted facts. Deceitful statements of half-truths may constitute false or fraudulent representations;

Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, a co-conspirator acted with the intent to defraud, that is, the intent to deceive and cheat; and

Fourth, a co-conspirator used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

**B.    Count Two: Conspiracy to Defraud the United States and to Commit Offenses Against the United States, in violation of 18 U.S.C. § 371:**

1.    Defrauding the United States

First, beginning in or about July 2024, and ending in or about August 2024, there was an agreement between two or more persons to defraud the United States by obstructing the lawful functions of the Small Business Administration by deceitful or dishonest means as charged in the Information;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act on or about July 30 or 31, 2024, for the purpose of carrying out the conspiracy.

2.    Committing an Offense Against the United States

First, beginning in or about July 2024, and ending in or about August 2024, there was an agreement between two or more persons to commit at least one crime, i.e., Obstruction of Justice;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

With respect to this object of the conspiracy, the elements for Obstruction of Justice are

as follows:

       First, the defendant knowingly altered, destroyed, concealed, or falsified a record, document, or tangible object; and

       Second, the defendant acted with the intent to impede, obstruct, or influence an actual or contemplated investigation of a matter within the jurisdiction of any department or agency of the United States.

The defendant fully understands the nature and elements of the crimes charged in the Information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V.   MAXIMUM SENTENCE

### A.   Maximum Penalty.

The maximum sentence that the Court can impose on each count is 5 years of incarceration, a fine of $250,000, a 3-year period of supervised release and a special assessment of $100. By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count(s) to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B.   Violations of Supervised Release.

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to 2 additional years imprisonment.

## VI.   SENTENCING DETERMINATION

### A.   Statutory Authority.

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the

Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

### B.    Stipulated Guideline Calculation.

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

As to **Count 1**:

| Offense Conduct or Characteristic | Guidelines Section | Offense Level Adjustment |
|---|---|---|
| Base offense level | 2B1.1(a)(2) | 6 |
| Loss Amount | 2B1.1(b)(1)(F) | 10 |
|  |  | 16 |

As to **Count 2**:

| Offense Conduct or Characteristic | Guidelines Section | Offense Level Adjustment |
|---|---|---|
| Base offense level | 2J1.2 | 14 |
|  |  | 14 |

### Grouping:

Under U.S.S.G. §§ 3D1.2-3D1.4, the two conspiracies do not group. Each is assigned one unit, because they are less than four levels apart. U.S.S.G. § 3D1.4. Two units results in the application of a two-level increase to the offense level of the highest calculated offense level, which here is 16. *Id.* Therefore, the offense level becomes 18.

///

**Acceptance of Responsibility:**

*See* paragraph III.B.2 above.

**Zero-Point Offender:**

Under U.S.S.G. § 4C1.1, a two-level deduction applies.

**Criminal History:**

The parties estimate, but do not stipulate, that the defendant's criminal history category will be I.

**Departures or Other Enhancements or Reductions:**

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, except that the government may move for a departure or an adjustment based on the defendant's cooperation (§5K1.1) or post-plea obstruction of justice (§3C1.1). Both parties agree not to move for, or argue in support of, any departure from the Sentencing Guidelines.

The defendant is free to recommend to the Court whatever sentence he believes is appropriate under 18 U.S.C. § 3553(a). The government may argue against a variance.

## VII.   WAIVERS

### A.   Waiver of Constitutional Rights.

The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be compelled to incriminate himself.

### B.   Waiver of Appeal and Collateral Attack.

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence. The defendant agrees as part of his plea, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum for the offense to which he is pleading guilty. The defendant

understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this agreement is insufficient to support the defendant's plea of guilty. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E herein.

### C. Waiver of Attorneys' Fees and Costs.

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).

### VIII. ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX. APPROVALS AND SIGNATURES

### A. Defense Counsel.

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: 11/1/2025

TODD A. PICKLES
Attorney for Defendant

### B. Defendant:

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: 11/1/25

GREG CAMPBELL
Defendant

### C. Attorney for United States:

I accept and agree to this plea agreement on behalf of the government.

Dated: 11/3/2025

ERIC GRANT
United States Attorney

MICHAEL D. ANDERSON
ROSANNE RUST
KATHERINE T. LYDON
Assistant United States Attorneys

PLEA AGREEMENT                                13

# EXHIBIT "A"

## Factual Basis for Plea

### I. *Summary of the conduit scheme*

From February 2022 through September 2024, defendants Greg Campbell, Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 4, and others working at their direction used false statements and material omissions to divert approximately $225,000 from campaign funds to Co-Conspirator 4's personal use. They conspired to funnel the money from campaign bank accounts through other entities to disguise the money's origin. After transferring the money through other entities' accounts, the money was disguised as salary and 1099 income to Co-Conspirator 4's spouse (Co-Conspirator 5) for a "no-show job".

### II. *The campaign account*

In 2021, Co-Conspirator 4 was the Chief of Staff to a California elected official (Public Official 1). When Public Official 1 was confirmed to a United States government position, Co-Conspirator 4 agreed to be Public Official 1's Chief of Staff for the new position.

At that time, Public Official 1 had a state campaign fund containing contributions designated for a future state campaign. Federal ethics rules, however, prohibited Public Official 1 from actively engaging in campaign-related activities while serving in his federal position. To comply with these rules, Public Official 1 allowed his campaign account to become dormant. Public Official 1 moved the existing state campaign funds to a new campaign account for a future campaign. In these accounts (collectively, "the dormant campaign accounts"), the funds were to be used for basic account maintenance and not for any active campaign-related activity. Public Official 1 delegated to Co-Conspirator 4 responsibility for arranging for the fund to be monitored and overseen by a third party.

### III. *The origin of the conduit scheme*

Co-Conspirator 4's new federal Chief of Staff job involved a pay cut to approximately $183,100 per year and, because Co-Conspirator 4 did not want to fully relocate to the East Coast, additional travel and living expenses. Co-Conspirator 4 was also generally prohibited by government ethics rules from receiving outside income and participating in other employment. Co-Conspirator 4's expenses exceeded his income, however.

In early 2022, Co-Conspirator 4 and Co-Conspirator 1 met to discuss Co-Conspirator 4's desire for more money. At that time, Co-Conspirator 1 was running a public affairs company (Company A). They reached an agreement where Co-Conspirator 4 would have Public Official 1's dormant campaign account pay Co-Conspirator 1 $7,500 per month, purportedly for managing the account. Co-Conspirator 1 would then pay $10,000 per month from Company A to Company C, a collective consistently controlled by Campbell, with, at times, Co-Conspirator 1 or Co-Conspirator 2.[1] Company C would then pay a salary of $10,000 a month to Co-Conspirator 4's spouse as W-2 income. The purpose of the

---

[1] There was a period of time when Co-Conspirator 2 took over the arrangement from Co-Conspirator 1 in which only Campbell was actively on the bank account for Company C that was used to funnel the money to Co-Conspirator 4.

PLEA AGREEMENT                          A-1

payments from the dormant campaign account was so that Co-Conspirator 1 would not have to bear the entire cost of Co-Conspirator 4's spouse's no-show job.

### IV. Phase 1 of the conduit scheme

Consistent with Co-Conspirator 4 and Co-Conspirator 1's agreement, between April and December 2022, Co-Conspirator 1 made payments to Co-Conspirator 4's spouse through the conduit arrangement, with the money deposited into an account monitored and controlled by Co-Conspirator 4. Co-Conspirator 1 did not have Co-Conspirator 4's spouse do any substantive work. In fact, after Co-Conspirator 4's spouse was set up in the payroll system at the beginning of the scheme, Co-Conspirator 1 and Co-Conspirator 4's spouse did not communicate at all.

### V. Phase 2 of the conduit scheme

Around November 2022, Co-Conspirator 1 told Co-Conspirator 4 that she was going to take a job as the Chief of Staff to a California state elected official. In that position, she would be prohibited from operating Company A. Co-Conspirator 1, however, arranged for Co-Conspirator 2 to take over the payments.

Co-Conspirator 4 informed Public Official 1 that Co-Conspirator 2 would be taking over the campaign account monitoring function. He also told Public Official 1 that his spouse would be going to work for Company C. Co-Conspirator 4 did not tell Public Official 1 that his spouse's pay was and would be paid using campaign funds passed through Co-Conspirator 1 and Co-Conspirator 2 to Company C. He likewise did not tell Public Official 1 that his spouse was not actually doing work. Given his relationship to Public Official 1, Co-Conspirator 4 had a duty to disclose those facts, but he did not because he did not want Public Official 1 to stop the scheme.

In January 2023, Co-Conspirator 1 emailed[2] Campbell, Co-Conspirator 2, and a Company C employee making it clear that payments to Co-Conspirator 2 were to be passed through to Co-Conspirator 4: "[Co-Conspirator 2] will invoice the [Public Official 1] campaign for $10,000 per month via [Co-Conspirator 2]" so Co-Conspirator 2 can "cover [Co-Conspirator 4's spouse's] contract ($120,000)".

#### A. Invoices

Consistent with Co-Conspirator 1's instructions, Co-Conspirator 2 began billing the campaign account $10,000 per month through her consulting company, Company B, in January 2023. To get paid, she sent invoices to the law firm managing the campaign account (Law Firm 1). Co-Conspirator 2 alleged in every invoice she sent to Law Firm 1 that the money was for her "consulting services." In reality, Co-Conspirator 2 served as a pass through for the money to Co-Conspirator 4.

Law Firm 1 paid Co-Conspirator 2 by check. Before issuing a check, Co-Conspirator 4 had arranged that Law Firm 1, which was unaware of his spouse's marital relationship or the pass through to his spouse, would typically seek Co-Conspirator 4's spouse's approval to pay Co-Conspirator 2's invoice.

---

[2] This email and the others discussed constitute wires that moved in interstate commerce.

PLEA AGREEMENT                                A-2

Law Firm 1 and its employees relied on Co-Conspirator 2, Co-Conspirator 1, and Co-Conspirator 4's representations, and Co-Conspirator 4 and his spouse's approval that the money billed for was in fact for the consulting services. If Law Firm 1 and its employees had known the true purpose of the payments, they would not have issued the checks from the dormant campaign accounts, nor would they have prepared misleading campaign disclosures about the payments.

### B. *Payments*

Once Co-Conspirator 2 received a payment from Law Firm 1, Co-Conspirator 2 would deposit the check into her Company B bank account at Bank 2.[3] Then she would pay it to Company C, generally disguised as part of her "rent" and overhead for the month. For example, in February 2023, a Company C employee emailed: "[Co-Conspirator 2]: $10,700 + $10,000 (March [Co-Conspirator 4's spouse's first name]) = $20,700 (I invoiced [Law Firm 1] on 2/14 for March so you should receive payment soon.")." After receiving this type of email, Co-Conspirator 2 would then transfer the money to Company C. Company C would pay the payroll company, and finally, Co-Conspirator 4's spouse would receive a wire transfer[4] from the payroll provider into a bank account at Credit Union 1 that only Co-Conspirator 4 himself accessed.[5]



### VI. *The attempted coverup*

#### A. *The April 2024 media inquiries and May 2024 backdated contract*

In April 2024, news reports, and later, an Office of Special Counsel investigation, raised questions about Co-Conspirator 2's payments from the campaign. The lawyer managing the dormant campaign account emailed Co-Conspirator 1 asking for Co-Conspirator 1's approval to send a reporter a response based on the lawyer's understanding of Co-Conspirator 2's payments, including the following:

> [Co-Conspirator 2] has been paid to oversee the Committee and manage its operations while [Public Official 1] has been serving in Washington, including payment of ongoing expenses and filing of required campaign reports.
>
> [Co-Conspirator 2] has continued to provide committee management services this year and has been paid for those services.

Co-Conspirator 1 responded, approving the statement by stating, "Talked to them. Good to go with just this from you."

---

[3] At all relevant times, Bank 2 was a financial institution as defined in 18 U.S.C. § 20.
[4] Each of these wire transfers involved a wire transmission in interstate commerce.
[5] At all relevant times, Credit Union 1 was a financial institution as defined in 18 U.S.C. § 20.

PLEA AGREEMENT        A-3

In May 2024, at Co-Conspirator 2's direction, a Company C employee emailed Co-Conspirator 4's spouse a backdated work contract, which purported to have been entered in January 2023. Co-Conspirator 4's spouse refused to sign it. Co-Conspirator 4 talked to Co-Conspirator 1 who said she would take care of it by talking to Co-Conspirator 2.

### B. *July and August 2024 meetings*

On or about July 29, 2024, Co-Conspirator 1, Co-Conspirator 2, and Campbell met for lunch near the California State Capitol. During their meeting, which the FBI recorded and surveilled, they discussed "the [Public Official 1] thing." Co-Conspirator 2 expressed apprehension and that she wanted to end the arrangement. She expressed concern that she did not have a contract with anyone involved and inquired if the lawyer knew they were paying Co-Conspirator 4's spouse. Co-Conspirator 1 responded that "no" the lawyer did not know that they were paying Co-Conspirator 4's spouse and she would reach out to him to try to handle things. Campbell, a California lobbyist, advised if Co-Conspirator 2 wanted to stop the arrangement, they "need[ed] to figure [it] out, and [he'd] help if" Co-Conspirator 2 needed him to. Campbell explained: "we need to probably eat one or two months so it doesn't line up directly from when you quit and stop paying her." Campbell explained the need to obfuscate the connection between the payments, saying, "whenever you quit, we probably have to at least pay one month or otherwise it's going to look—it's going to just raise red flags potentially." After their lunch, Co-Conspirator 1 tried following up with the lawyer, which is corroborated by phone toll records.

Co-Conspirator 2 and Campbell met four days later, on or about August 2, 2024, at Company C's office and discussed the conduit scheme. Campbell said that the arrangement was "always set up to be somewhat icky" and he admitted the arrangement was structured so that they were "act[ing] as a passthrough for people that [we]re friends." Campbell further acknowledged that such conduct amounted to "laundering money," and it was, indeed, "wrong".

After that conversation, Co-Conspirator 2 stopped making payments. When Co-Conspirator 4 did not receive the monthly payment in August 2024, he asked his spouse to find out what was going on from Co-Conspirator 2. After his spouse refused, Co-Conspirator 4 reached out to Co-Conspirator 2 himself.

On August 29, 2024, Co-Conspirator 4 and Co-Conspirator 2 spoke on the phone. During their conversation, Co-Conspirator 4 attempted to justify the arrangement. He asked Co-Conspirator 2 to continue it for a time so he could "transition out" of his federal job and try to get his "pension out of the federal government." He explained the "money you guys are giving me is helping me fly back and forth to to uh DC and live there half part time."

Co-Conspirator 2 and Co-Conspirator 4 then met for coffee on or about September 6, 2024, where again they discussed the conduit scheme. Co-Conspirator 4 tried to allay Co-Conspirator 2's expressed concerns. Co-Conspirator 2, however, did not resume the payments.

At all relevant times, the dormant campaign accounts were located at Bank 1, a financial institution as defined in 18 U.S.C. § 20.

VII. *The Obstruction Conspiracy*

   A. *Subpoena*

During the summer of 2024, Co-Conspirator 1 was in the process of responding to a federal civil subpoena she received pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) issued by the Eastern District of California, regarding a PPP loan she obtained during the pandemic. The subpoena requested documents related to Co-Conspirator 1's company's, Company A, eligibility for PPP loans, loan forgiveness, and its revenue from lobbying activity.

To respond to the subpoena, Co-Conspirator 1 believed she needed to reach out to several individuals with whom she previously worked, including Co-Conspirator 2 and Campbell, to try and obtain documents responsive to the subpoena.

   B. *July 29, 2024 Meeting*

Co-Conspirator 2, Co-Conspirator 1, and Campbell met for lunch in downtown Sacramento, near the Capitol, on or about July 29, 2024. During their lunch, Co-Conspirator 1 brought up the investigation regarding her PPP loan. After discussing other topics, Co-Conspirator 1 told the others, "I'm still in this like fucking, my PPP loan got popped bullshit," and as a result, she needed to get a copy of her contracts with individuals such as Co-Conspirator 2 and Campbell. Co-Conspirator 1 acknowledged that she never had a contract with Campbell, but she asked him to have a "[Company C employee] do like a retroactive one." She further told Campbell she would just "text [him] like the years" she needed, and she told him the contract should, "say that [Campbell] w[as] sub-contracting with [her] to provide general advice, umm, to [his] clients, there was no lobbying or anything like that." Campbell agreed and he told Co-Conspirator 1 to, "just shoot [him] a text with what [she] needs it to say, and [he]'ll go ta, go see the "[Company C employee] right after this."

   C. *Backdated, False Contracts*

Then, on or about July 30, 2024, Co-Conspirator 1 sent Campbell the following text: "On the contracts, I need 3 (2019, 2020, 2021) of the same that says [Company A] is sub to various clients of Campbell to provide strategic advice. [Company A] is prohibited from providing any lobbying services." In response, Campbell said, "On it." He then followed up, asking, "Do we need amounts?"

After asking this question, Campbell directed a Company C employee to create the three requested contracts. Using her work laptop, the Company C employee did as she was instructed that day. The Company C employee then printed the fabricated contracts out and gave them to Campbell in hard copy form.

Co-Conspirator 1 then finally responded to Campbell's text message about amounts; saying, "I don't think so." Campbell agreed, texting "Ya. Me either. They are all done and here for you when you get a chance. Call me for details if/when you can."

The following day, on or about July 31, 2024, Co-Conspirator 1 texted Campbell, "Can you sign the contracts and have [the Company C employee] email them to me?" Campbell responded, "And then you will sign? Sure. I've signed." Co-Conspirator 1 said, "Yes" and Campbell texted back, the "[Company C employee's] not here today so I'll figure it out. Are you coming in today. Might be better to just drop off rather than email. I'll walk them over." Co-Conspirator 1 then told Campbell, "I can swing by."

PLEA AGREEMENT                                    A-5

Later on, Co-Conspirator 1 did "swing by" Company C's office and Campbell gave her the three hard copy, fake contracts Campbell created at Co-Conspirator 1's request. The contracts were signed and backdated. The fake contracts made it appear as though Co-Conspirator 1 was only providing non-lobbying services to her clients and her firm was only a subcontractor for Campbell's independently owned lobbying firm, Company D. In truth, Company A was not subcontracting with Company D as those companies did work for shared clients. Additionally, as Campbell and Co-Conspirator 1 knew, Co-Conspirator 1's company, Company A, had done some lobbying work.

On or about August 1, 2024, Campbell followed up with Co-Conspirator 1. In his text to her, he said "On [the] contracts eventually I'll need copies for [the Company C employee] too. . . . [the Company C employee will be] sending you a specific document from [Company Z] that may help. . . . What do you think I need from [Company Z]"? Co-Conspirator 1 responded, "It's just that I wasn't lobbying."

On or about August 2, 2024, Co-Conspirator 2 met with Campbell at Company C's office. During their meeting, Campbell and Co-Conspirator 2 discussed several topics. One topic was Campbell's decision to help Co-Conspirator 1 with the fabricated contracts she requested. Campbell admitted, "I just backdated contracts for her and me. . . ."

*I, Greg Campbell, have carefully reviewed the above factual basis and agree that the facts set forth within are true and accurate insofar as my own conduct is concerned.*

11/1/25
Date

Greg Campbell